AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) ) ) |
| TWELVE (12) DIGITAL DEVICES FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT FBI WASHINGTON FIELD OFFICE, 601 4TH ST, NW, WASHINGTON, DC 20535 UNDER RULE 41 | Case No.  21-SC-2244 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located in the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2252A(a)(2), Distribution of Child Pornography; Title 18, United States Code, Section 2252(a)(2), (b)(1) Conspiracy to Distribute Child Pornography. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Emily Eckert, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means)*.

Date: _____ 7/9/2021 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

G. Michael Harvey
United States Magistrate Judge

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☑ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| TWELVE (12) DIGITAL DEVICES FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT FBI WASHINGTON FIELD OFFICE, 601 4TH ST, NW, WASHINGTON, DC 20535 UNDER RULE 41 | ) Case No.  21-SC-2244 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .

*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 22, 2021 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for _____ days *(not to exceed 30)*    ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 7/9/2021 _____      _____

*Judge's signature*

City and state: _____ Washington, D.C. _____      _____ G. Michael Harvey _____

United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SC-2244 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is:

- iOmega hard drive S/N G5AB057446

- Black Toshiba hard drive S/N Z1CAP55DTQ11

- Red Western Digital My Passport Ultra hard drive S/N WX61AC4KL8XT

- Silver Seagate hard drive S/N NA7Q5WTY

- Blue 1GB SanDisk SD Card S/N BB0725105013D

- Purple/White Kingston 4GB DataTraveler USB Drive

- Orange/White 32GB SanDisk USB Drive

- Silver/Pink 4GB Kingston DataTraveler USB Drive

- Black Yuandi USB Disk Recorder

- Black/Red SanDisk Cruzer Glide 32GB USB Drive

- Blue USB Drive (no markings)

- Blue/Silver "Air Force Academy" USB Drive

hereinafter the "Devices."  The Devices are currently located at FBI Washington Field Office,

601 4th St. NW, Washington, DC, 20535.

**ATTACHMENT B**

*Property to be seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of (1) Title 18, United States Code, Section 2252A(a)(2), Distribution of Child Pornography; (2) Title 18, United States Code, Section 2252(a)(2), (b)(1) Conspiracy to Distribute Child Pornography, as described in the search warrant affidavit, including, but not limited to: All records and information relating to violations of Title 18, United States Code, Sections 2251(a) and 2252(a)(2), including:

      a.     Child pornography;

      b.     Child erotica;

      c.     Visual depictions of minors engaged in sexually explicit conduct;

      d.     Information,[1] correspondence, records, documents or other materials constituting evidence of or pertaining to items "a" through "c" above (namely child pornography, child erotica, and visual depictions of minors engaged in sexually explicit

---

[1] As used in this attachment, the terms "information" and "records" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

1

conduct), or constituting evidence of or pertaining to the possession, transportation, receipt, distribution, or transmission through interstate or foreign commerce of items "a" and "c" above, or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children, including:

a. Correspondence or communications, such as electronic mail, chat logs, and electronic messages;

b. Internet usage records, user names, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

c. Diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the computer and internet websites;

d. Shared images, "friends lists," and "thumbnails"; and

e. Financial records, including credit card information. evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2

f.   evidence of software that would allow others to control the DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

g.   evidence of the lack of such malicious software;

h.   evidence indicating how and when the DEVICES were accessed or used to determine the chronological context of DEVICES access, use, and events relating to crime under investigation and to the DEVICES user;

i.   evidence indicating the DEVICES user's state of mind as it relates to the crime under investigation;

j.   evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

k.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICES;

l.   evidence of the times the DEVICES were used;

m.   passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

n.   documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

3

o.  records of or information about Internet Protocol addresses used by the DEVICES;

p.  records of or information about the DEVICES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

q.  contextual information necessary to understand the evidence described in this attachment.

r.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

s.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

t.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

u.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

4

v.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

w.   records of or information about Internet Protocol addresses used by the Device(s); and

x.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TWELVE (12) DIGITAL DEVICES FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT FBI WASHINGTON FIELD OFFICE, 601 4TH ST, NW, WASHINGTON, DC 20535 UNDER RULE 41** | **SW No. 21-sc-2244** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Emily Eckert, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—digital devices—which are currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such. I have been so employed since March, 2016. Currently, I am assigned to the Washington Field Office, where I am responsible for conducting and assisting in investigations involving child pornography, the sexual exploitation of children, and human trafficking.  I have gained experience through training with the FBI and in my everyday work related to conducting these types of investigations. During my career as an FBI agent, I have (a) participated in the execution of search warrants and arrest warrants for various

6

crimes; (b) reviewed and analyzed numerous recorded conversations and other documentation of criminal activity; (c) debriefed cooperating confidential human sources; (d) monitored wiretapped conversations; and (e) conducted physical surveillance of individuals engaged in various crimes.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including the sexual exploitation of children offenses in violation of 18 U.S.C. §§ 2251 and 2252.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of (1) Title 18, United States Code, Section 2252A(a)(2), Distribution of Child Pornography; (2) Title 18, United States Code, Section 2252(a)(2), (b)(1), Conspiracy to Distribute Child Pornography have been committed by SHAUN JASON MARVIN and other individuals law enforcement is working to fully identify.  There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is:

- iOmega hard drive S/N G5AB057446

- Black Toshiba hard drive S/N Z1CAP55DTQ11

- Red Western Digital My Passport Ultra hard drive S/N WX61AC4KL8XT

- Silver Seagate hard drive S/N NA7Q5WTY

- Blue 1GB SanDisk SD Card S/N BB0725105013D

- Purple/White Kingston 4GB DataTraveler USB Drive

- Orange/White 32GB SanDisk USB Drive

- Silver/Pink 4GB Kingston DataTraveler USB Drive

- Black Yuandi USB Disk Recorder

- Black/Red SanDisk Cruzer Glide 32GB USB Drive

- Blue USB Drive (no markings)

- Blue/Silver "Air Force Academy" USB Drive

that is, the "Devices."

7.      The Devices are currently located at FBI Washington Field Office, 601 4th St. NW, Washington DC 20535.

## PROBABLE CAUSE

8.      On October 1, 2020, at approximately 9:17 AM a FBI Task Force Officer was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force, operating out of a satellite office in

Washington, D.C.  In that capacity, the Under Cover Employee (UCE) entered a public KIK[2] group titled, "#you.ngshare" with a group display name of "Safe place." Upon entering the group a rules banner appeared outlining the rules of the group. The banner read, "-Hello and welcome! Send 3 images or videos to the owner or admin to verify! – Three minutes to verify – Share here don't pm."

9.      Upon entering the group the UCE introduced himself as a 33-year-old dad with a daughter.    On October 1, 2020, an administrator[3] of the group using the KIK name, "matt11clashofclans," and showing display name "Matt S," who was later identified as Matthew Hunter Sharp  (hereinafter SHARP)[4], initiated a private KIK message with the UCE. SHARP asked the UCE to "verify."[5] The UCE sent an image of his purported eight-year-old daughter clothed.[6] SHARP responded, "I either need cp[7] or it needs to be a live photo." The UCE sent SHARP a live photo of his purported daughter. SHARP thanked the UCE and verified him. SHARP further stated that most users in the group are "cp collectors."

---

[2] Kik is a freeware instant messaging mobile application where one can transmit and receive messages, photos, videos, sketches, mobile webpages, and other content.

[3] The administrator in a KIK Group is responsible for inviting new members to the group, banning members from the group, and establishing the rules of the group. There may be multiple administrators of a single group, each with these privileges.

[4] SHARP was arrested by FBI Agents on January 7, 2021 in Dayton, Ohio pursuant to arrest warrant issued in the District of Columbia.

[5] Based on her training and experience, your affiant is aware that "verify" means to prove that a user has access to children or possesses child pornography.

[6] This photograph and the other photographs sent by the UCE did not depict a real child.

[7] Based on her training and experience, your affiant is aware that "cp" is an abbreviation for child pornography.

10.     Between October 1 and October 28, 2020, there were upwards of 40 members within the #you.ngshare group. During this period various users within the group continued to share images and videos of child pornography and discussed the sexual abuse of children.

11.     On October 13, 2020, user "marvinmash," showing display name "PBJ PBJ," and later identified as Shaun Jason Marvin (hereinafter MARVIN) posted a one minute video to the group which depicts two female children approximately eleven to thirteen years old sitting nude on the floor, while on camera they remove their clothes, spread their legs apart and expose their bare vaginas directly into the camera. On October 15, 2020, MARVIN also posted a one minute fifty six second video file which consists of approximately eighteen videos spliced together, all of which depict the faces of prepubescent female children as men ejaculate on their faces or in their mouths. The video file opens with the following words printed on the screen "Sweet release… Girls getting showered in CUM."

12.     On October 17, 2020 MARVIN also posted a forty nine second video file to group which depicts a female child approximately nine to eleven years sitting on the floor nude. The child turns around while on her hands and knees and spreads her buttocks apart with her hands exposing her anus and vagina to the camera and then sits with her legs spread apart exposing her vagina to the camera before masturbating for the camera.

13.     In response to the administrative subpoena for subscriber and IP log information associated with KIK user "marvinmash," KIK provided records indicating that the account has a display name of "PBJ PBJ" and an associated and confirmed email address of shaun.marvin@gmail.com. The user provided date of birth was listed as 11/1/1978. IP log information spanning October 4, 2020, to October 15, 2020, was also provided, and identified a Comcast IP address, 75.70.117.71, repeatedly used to access the target account, as well as several T-Mobile IPV4

natting IP addresses. In response to an administrative subpoena, Comcast Communications provided records indicating that at the date and times IP address 75.70.117.71 was used to access the "marvinmash" KIK account, it was subscribed to by Shaun Marvin, with a service address at 3002 W Pikes Peak Ave, Colorado Springs, CO, 80904. A query of the Colorado Department of Motor Vehicles database identified a valid driver's license for SHAUN JASON MARVIN with a date of birth 11/1/1978. A query of a subscription database located MARVIN's current address as 3002 W Pikes Peak Ave, Colorado Springs, CO. According to El Paso County, Colorado property records, MARVIN is the owner of 3002 W Pikes Peak Ave, Colorado Springs, CO, purchased in February 2016.

14.    On January 7, 2021 MARVIN was arrested in Colorado Springs, Colorado pursuant to an arrest warrant authorized by the Honorable G. Michael Harvey, United States Magistrate Judge for the District Court for the District of Columbia. On the same date, MARVIN's residence 3002 Pikes Peak Avenue, Colorado Springs, Colorado 80904 was searched pursuant to a search and seizure warrant authorized by the Honorable Michael E. Hegarty, United States Magistrate Judge for the District Court for the District of Colorado. Multiple items of digital evidence were seized.

15.    Digital forensic review of the items seized from the 3002 Pikes Peak Avenue residence, specifically a cell phone and an encrypted external hard drive, revealed thousands of images and videos depicting child sexual abuse material (CSAM).

16.    In February, 2021 FBI Agents interviewed MARVIN's ex-wife, Nicole Marvin. Nicole Marvin told Agents she possessed several electronic devices in her attic that had been primarily used by MARVIN before he moved out of their joint residence in January, 2017. Nicole Marvin had hidden the devices in her attic, and MARVIN had unsuccessfully attempted to find the

devices prior to moving out of the residence. On February 16, 2021 Nicole Marvin voluntarily provided the following twelve (12) digital devices to the FBI and signed an FD-26 Consent to Search Computers for the items:

- iOmega hard drive S/N G5AB057446

- Black Toshiba hard drive S/N Z1CAP55DTQ11

- Red Western Digital My Passport Ultra hard drive S/N WX61AC4KL8XT

- Silver Seagate hard drive S/N NA7Q5WTY

- Blue 1GB SanDisk SD Card S/N BB0725105013D

- Purple/White Kingston 4GB DataTraveler USB Drive

- Orange/White 32GB SanDisk USB Drive

- Silver/Pink 4GB Kingston DataTraveler USB Drive

- Black Yuandi USB Disk Recorder

- Black/Red SanDisk Cruzer Glide 32GB USB Drive

- Blue USB Drive (no markings)

- Blue/Silver "Air Force Academy" USB Drive

17.    The twelve (12) digital devices have been maintained pursuant to FBI evidence policy since the February 16, 2021 and are currently located at the FBI Washington Field Office, 601 4th St. NW, Washington, DC, 20535.

## TECHNICAL TERMS

18.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

12

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables

13

and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as

14

described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.

Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

        j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

        k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

        l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example,

www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

      n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

           i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

18

        ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

        o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

19.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

1.              Individuals who engage in criminal activity, including

a.      Individuals who engage in criminal activity, including violations of 18 United States Code, Sections 2251 and 2252, use digital devices, like the Device, to access websites to facilitate illegal activity and to communicate with victims, witnesses, and co-conspirators online; to store on digital devices, like the Device, documents, photographs, recordings, messages, and other records relating to their illegal activity, which can include logs of online chats; email correspondence and correspondence through other applications; text or other "Short Message Service" ("SMS") messages; contact information of victims, witnesses, and other co-conspirators, including telephone numbers, email addresses, identifiers for instant

messaging and social medial accounts; names, addresses, telephone numbers, and social security numbers of other individuals; records of internet searches and Web History browers; IP addresses; and other means used in furtherance of these crimes as stated above, incorporated by reference here.

       a.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

       b.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these

files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends

less on when the file was downloaded or viewed than on a particular user's operating system,

storage capacity, and computer, smart phone, or other digital device habits.

20.     As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes

how the digital device(s) were used, the purpose of their use, who used them (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by

agents and others involved in this investigation and in the forensic examination of digital devices,

I respectfully submit there is probable cause to believe that this forensic electronic evidence and

information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture, movie, or

texting files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and who

has been responsible for creating or maintaining records, documents, programs, applications, and

materials contained on the digital device(s) are, as described further in the attachments, called for

by this warrant.  Those records will not always be found in digital data that is neatly segregable

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

Digital data stored in the Device(s), not currently associated with any file, can provide evidence

of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

23

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.    I know that when an individual uses a digital device to produce child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

24

## **METHODS TO BE USED TO SEARCH DIGITAL DEVICES**

21.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text

26

format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are

often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

        22.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

        a.      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

        b.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous

28

to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

23.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

24.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Janani Iyengar, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

25.     I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Emily Eckert
Special Agent
FBI

Subscribed and sworn to before me on this _____ day of July, 2021:

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

30